UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| HOLLY A. PLATT, | ) | CIV. 08-5090-KES |
| | ) | |
| Plaintiff, | ) | ORDER REVERSING |
| | ) | DECISION OF THE |
| vs. | ) | COMMISSIONER AND |
| | ) | REMANDING FOR |
| MICHAEL J. ASTRUE, | ) | CALCULATION AND |
| Commissioner, Social Security | ) | AWARD OF BENEFITS |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

On October 18, 1995, plaintiff filed for disability insurance benefits

under sections 216 and 223 of Title II of the Social Security Act (the "Act"),

42 U.S.C. §§ 416(I) and 423. (AR 54-57).[1] After her application was denied at

the initial and reconsideration levels, a hearing was held on May 7, 1997. The

Administrative Law Judge (ALJ)[2] issued his decision on July 23, 1997, which

was adverse to plaintiff. (AR 16-20). The Appeals Council denied plaintiff's

request for review. Plaintiff filed a civil action in United States District Court,

CIV. 00-5003, and on July 11, 2000, District Judge Karen E. Schreier issued a

memorandum opinion and order for remand. (AR 267-276).

---

[1]The court will cite to information in the administrative record by
referencing "AR," followed by the appropriate page number(s) where the
information can be found.

[2]Three different ALJs have been involved in this case. For clarity they
will be referred to as ALJ #1, ALJ #2 and ALJ#3.

A hearing on remand was held on June 7, 2001, with a supplemental hearing being held on November 28, 2001. On that record, ALJ #2 issued a decision adverse to plaintiff on April 16, 2002. (AR 316-322). The Appeals Council vacated that decision and remanded for further proceedings, including a new decision. (AR 352-356). Plaintiff waived her right to appear at the remand hearing and on August 1, 2005, ALJ #2 issued a second decision based upon the record. (AR 406-414).

On July 18, 2006, the Appeals Council again vacated the decision of the ALJ, and ordered a new hearing before a different ALJ. (AR 424-427). A supplemental hearing was held on December 17, 2006. ALJ #3 issued his decision adverse to plaintiff on February 7, 2007. (AR 245-265). After an approved extension to file objections to that decision, on May 20, 2008, plaintiff filed her exceptions. (AR 235-236). On November 7, 2008, the Appeals Council declined jurisdiction over the case and the decision of the ALJ became the final decision of the Commissioner. (AR 231). Plaintiff timely filed her complaint in district court. (Docket 1).

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Holly A. Platt was born in 1961. (AR 37). She obtained a high school GED and was in the U.S. Air Force from February of 1980 to February of 1984. (AR 37). She and her husband, Jim Platt, were married in January of 1984 and they divorced in January of 1996. (AR 184).

Ms. Platt became aware of her "problems" (Post-Traumatic Stress Disorder (PTSD) and depression) shortly after their marriage. (AR 37, 39). She

described her first symptoms of these problems as "weight gain and isolation." (AR 37-38). The isolation was evidenced by her decreased social life, her desire to stay at home and not wanting to visit friends. (AR 38). Before her marriage she felt the "isolation" but hid her feelings through the use of alcohol. (AR 44).

Ms. Platt testified that she got through the military "drinking alcohol." (AR 41). She would drink fifteen beers or mixed drinks a night and considered herself to be a heavy drinker. (AR 47). This occurred every night while she was on active duty. (AR 48). Depression caused Ms. Platt to stay away from people and sleep too much. (AR 42). After leaving the military she experienced a "quick . . . sudden and maintained" weight gain. (AR 43).

While in the Air Force, Ms. Platt was in flight supplies, ordering parts or equipment, handing out individual equipment, i.e., parkas, boots, gloves. (AR 45). She completed her Air Force duty as an E-4 (sergeant). (AR 46). Her performance reviews were in the eight to nine range, with nine being the best. (AR 46).

During one weekend job in 1984 after leaving the military, she just started crying and nothing in particular set it off. (AR 40). She then began to experience nightmares and a fear of being outside or in crowds. (AR 38). Ms. Platt began to experience panic attacks in public places, which caused her to cry and feel a sudden need to leave wherever she was. (AR 38). Beginning in 1986, Ms. Platt recalls she started having a recurring dream - a nightmare of being murdered, stabbed to death. (AR 38). Ms. Platt also identified 1986 as the year in which she experienced an increase in her sense of isolation and fear

of being outside her home. (AR 39). She could not even go to the grocery store. (AR 39). She became hypervigilant, could not sit still and was very nervous. (AR 39).

Her first suicidal thoughts began at ten years of age. (AR 43). After her military service ended, Ms. Platt had frequent problems with concentration and it was difficult for her to remember simple things. (AR 43). During an agitated "major depressive episode," Ms. Platt would not eat, could not sleep, and vomited from being hypervigilant because "everything [made her] sick." (AR 43). Her husband did not want her to drink, so she then used food to cover up the symptoms of depression. (AR 44). Once she became pregnant Ms. Platt quit drinking altogether. (AR 48).

Her daughter was born in September of 1989.[3] (AR 44). Within a week of her daughter's birth, Ms. Platt started to have memories of being molested. (AR 45). She initially saw the base psychiatrist at the Homestead Air Force Base[4] in Florida after the birth of her child and he gave her ten days of antidepressants to help her sleep. (AR 51).

Ms. Platt counseled with Eugene Muldavin, a licensed clinical therapist, in 1990, shortly after her daughter's birth. (AR 45, 49). She saw Mr. Muldavin because she was depressed, could not stop crying, and was having flashbacks

---

[3]While the child's exact date of birth is protected information, her date of birth is documented in the record below. The month and year of the child's birth are important to this analysis.

[4]The transcript identifies "Home State" AFB, but that is obviously a typographical error.

of her own abuse.  (AR 49-50).  She saw Mr. Muldavin from 1990 until mid-August 1992 when a hurricane[5] struck Florida.  (AR 50).  All of her clinical records, including Mr. Muldavin's therapy notes, were destroyed in the hurricane.  (AR 52, 174).  After being evacuated from the area devastated by the hurricane, Ms. Platt eventually returned to Pierre, South Dakota, where her mother lived.  (AR 50).  She did not seek any mental health treatment while living in Pierre.  (AR 50).

Ms. Platt's former husband, Jim, submitted an affidavit relating his observations.  (AR 184-86).  He testified that during their first year of marriage in 1984 "Holly was happy-go-lucky, joyous, out-going . . . ."  Id. at 184.  Together they went fishing, cooked, took long drives and Holly "would easily socialize at [military] parties."  Id.  Mr. Platt testified that Holly "had several friends she spent time with on a regular basis" and she was "born to shop."  Id.  Mr. Platt's affidavit reflects that this positive attitude continued when they moved to Florida in 1986.  Id.

In July of 1987, Mr. Platt was stationed in Korea and Holly stayed with her mother in Pierre, South Dakota.  Id.  During this time, Holly would cry over the phone during visits with Jim.  In 1987, he reported that things changed.

> Holly started gaining a lot of weight and began to sleep a lot.  She didn't want to be seen or be out in public.  She stayed home and started isolating herself.  Then she started crying over nothing . . . . she stopped going to my military function . . . [and] stopped going fishing with me.

Id.

---

[5]Hurricane Andrew was one of the most powerful hurricanes to hit the Florida coast in the twentieth century.

When Jim returned to the United States in July of 1988 "Holly was really down in the dumps." Id. It was in July of that year that the Platt family moved back to Homestead, Florida. Id. at 185. This was when Mr. Platt noticed that:

> Holly had wild mood changes. She had gained more weight and was isolating herself. She would have crying spells. Everything was worse than right before I left for Korea. She tried to keep the house neat, but it was a real effort for her to get it done. Plus, the housework she did do, took her a lot longer . . . . For a woman who loved to shop, it was weird that now I couldn't even get her to the commissary, or to any military functions. She never wanted to go out at all. If I had visitors to our house she would only tolerate them, and often would go to another [room] and isolate.

Id.

Mr. Platt observed that Holly's condition worsened with her pregnancy in January of 1989. Id. "From that point on, it went down hill really bad. All of her symptoms got even worse and she went into a major depression." Id. After the baby was born "everything got ten times worse." Id. Mr. Platt testified that "Holly isolated herself so much that she wouldn't even sleep in our bed with me. She would stay in the bedroom with . . . our daughter." Id.

After Holly started therapy she would not tell her husband what was taking place in those sessions. Id. They attempted marriage counseling, but after a couple of sessions, Holly "backed-off and isolated from that." Id. Holly never shared her diagnosis of PTSD with her husband until after they were divorced. Holly then told Jim "she wanted to take her childhood molestation to the grave with her." Id.

Ms. Platt's sister, Gloria Hadrick, executed an affidavit describing her sister's condition during the 1989 time period. (AR 182-183). Ms. Hadrick

worked as a Patient Care Technician for sixteen years. (AR 182). She reported that before February of 1989:

> Holly was always outgoing. She had a zest for life and could always see the funny side of things. She had a lot of friends, who she always spent time with. She loved to talk and visit with her friends. She was also very involved in physical fitness and did a lot of running to stay fit. All of this changed in the late 1980's.

Id. Ms. Hadrick visited her sister in Florida in February of 1989 while Ms. Platt was pregnant. Id. During that visit, Ms. Hadrick observed:

> Holly had a flat affect. She couldn't follow a conversation. I would talk to her and she'd have to ask me what I had said or she thought I said something different than I had said . . . Holly was unwilling to go anywhere with us. She just wanted to sit in the house and smoke cigarettes. She did not want to do anything or go anywhere.

Id. During this visit, Ms. Hadrick discovered that Holly "had no personal friends. She was extremely isolated, and didn't seem to do much of anything." Id. Ms. Hadrick's affidavit confirms that Holly was "molested by our mother's boss" when Ms. Hadrick was age 15. Id.

After the birth of Holly's daughter, Ms. Hadrick spoke with her sister frequently by telephone. She reported that Holly would bring up her childhood memories of having been molested and would "continually repeat . . . her fears of her daughter being molested." Id. at 183. Ms. Hadrick also testified about her sister:

> [T]here was a short time period when she was seeing her therapist in Florida, that she started to get a little grip on reality. She stopped repeating herself during our phone conversations, and could carry on more of a normal conversation. This only lasted until the Hurricane happened. Then everything was ripped away from her. She lost everything in the Hurricane. She cried alot. She started obsessing

again about the Hurricane and everything she lost, especially the
pictures of her daughter.

Id. Ms. Hadrick concluded by stating that "Holly is not the same person that

she once was, and she has had these problems since the 1980's." Id.

On January 21, 1997, Eugene Muldavin completed a Psychiatric Review

Technique at the request of Ms. Platt's former attorney. (AR 173). In his own

handwriting under II. Reviewer's Notes, Mr. Muldavin stated:

> Ms. Platt was referred to my office for psychotherapy with an initial
> presented problem of depression - lack of clear future goal in 1991.
> She was a cooperative client - invested in making positive changes for
> herself and family. Early on I had (was given) insight into marital
> problem, and frequent stressful doubts re: parenting issues.

> When trust was established - Ms. Platt was able to get in touch with
> major dysfunctional family of origin issues and reviewed sexual abuse
> victimization issues. It became evident that much of her difficulty in
> relationships, work and academic performance had been severely
> adversely affected by traumatic events.

> Developmental changes - marriage, childbearing served to raise her
> awareness of past emotional problems - current life stresses
> combined with increased historical awareness provide Ms. Platt with
> acute distress.

> Nevertheless she put forth admirable effort to progress and managed
> to care for her daughter.
> Therapy stopped abruptly due to the Hurricane Andrew. My office
> and records were essentially destroyed.

> Recommendations include - continued therapy with a benign trusting
> therapist with extensive awareness on sensitivity to sexual abuse and
> trauma recovery.

(AR 174).

With this summary, Mr. Muldavin's report concluded that Ms. Platt suffered from a paranoid schizophrenic disorder, an affective disorder, and an anxiety disorder. (AR 173). These conditions resulted in an organic mental disorder, including memory impairment and depression with "feeling[s] of hopelessness, helplessness, haplessness." (AR 175). He reported that Ms. Platt "has had 'flash backs' related to sexual abuse victimization." Id. These conditions made it difficult for Holly to maintain concentration and stay on task or move beyond the traumatic sexual abuse she had experienced. (AR 176-177).

Mr. Muldavin identified her degree of limitation as "marked" or "frequent" in her activities of daily living and social functioning. (AR 180). She experienced "frequent" or "continual" deficiencies in concentration[6] and deterioration or decompensation in work or work-like settings.[7] (AR 180).

Mr. Muldavin found that these conditions caused Ms. Platt "repeated episodes of deterioration or decompensation . . . [with a]. . . current history of two or more years of inability to function outside of a highly supportive living situation." (AR 181). His report concluded that her anxiety related disorder

---

[6]Concentration, persistence or pace resulting in a failure to complete tasks in a timely manner, at work or otherwise.

[7]Episodes which cause Holly to withdraw from that situation or to experience exacerbation of signs and symptoms, including deterioration of adaptive behaviors.

symptoms result in a "<u>complete</u> inability to function independently outside the area of one's home.  <u>Id.</u> (emphasis in original).

On May 27, 1997, Mr. Muldavin wrote plaintiff's former attorney and clarified that his "commencement date of therapy with Ms. Platt was on or around the beginning of 1990."  (AR 230).  He again reaffirmed that his records had been destroyed after the hurricane.  <u>Id.</u>  His letter, now seven years after the fact, stated "[h]owever, my recollection of Ms. Platt's case and issues remain clear.  I stand behind my clinical assessments . . . ." <u>Id.</u>  In Mr. Muldavin's  opinion, the diagnosis and resulting functional limitations which he identified were in existence prior to September 30, 1989.  (AR 172).

Ms. Platt started counseling again in August 1994 because she was having "severe flashbacks and . . . wasn't functioning."  (AR 50).  Dr. T. H. Shannon with the Veterans Administration Medical Center at Ft. Meade, South Dakota, wrote on August 2, 1995:

> [Ms. Platt] has suffered months of depressed mood with mid-morning awakening, labillity, crying spells, poor self esteem, shame and guilt about past sexual abuse and rape (x2), emotional detachement [sic], isolation, fear of crowds ad [sic] people and cycles of daily thoughts or/and nightmares related to sexual trauma . . . Chronic SI [suicide ideation] w/o intent, plan or attempt since age 10 yrs.  Referred by Jack Sanders of  the  Vet  Center  who will start to follow her again . . . .

(AR 112).   Dr. Shannon noted that Holly suffered from depression and childhood PTSD, which were not combat related.  (AR 113, 117).

On October 10, 1995, Dr. Shannon wrote to Social Security stating that Ms. Platt "suffers from Post Traumatize [sic] Stress Disorder and Depression . . . . She is not employable at this time in my clinical opinion." (AR 132). That same day, Eugene Summers, M.S.W., a Team Leader at the Vet Center, wrote:

> Platt had been seen . . . since August 1994 for Post Traumatic Stress Disorder. One of the main issues she has been working on is her inability to work. Though she has tried to work several times in the past few months, every time she gains employment, she has been unable to handle job related stress. This experience has resulted in deep depression. It is the counselor's current opinion that Ms. Platt is unemployable. With the severity of her PTSD, it is highly doubtful that she will ever be employable.

(AR 133).

On November 6, 1995, Jack Sanders, M.S., also with the Vet Center, wrote:

> [I]t is my clinical impression that Holly suffers from delayed Post Traumatic Stress Disorder [PTSD] . . . . After doing extensive therapy with her, she is apparently too fragile to function effectively in a work situation. I have seen nothing in her behavior to suggest she could hold a job while her condition debilitates her. She has great difficulty maintaining a sense of self worth and adequate job performance for an employer. She becomes labile and disoriented when faced with any job stress. I think, Holly cannot function adequately in society to hold and perform in the world of work. Though she does well in therapy, she is unable to move beyond this and address the daily stress and pressure of the world.

(AR 135). He reported in earlier clinical notes that "Holly . . . was remembering more & more incidences and having her head pushed under water and screaming when she was being molested." (AR 156).

In her Disability Report of October 12, 1995, Ms. Platt was asked, "When did your condition first bother you," to which she responded "Feb 7 84."[8] (AR 76). Acknowledging that she had worked since that date, Ms. Platt indicated that her "condition" caused her to change her "job or job duties, hours of work, attendance." Id. She then stated her "condition finally [made her] stop working" altogether in August of 1995. Id. She explained that the condition which kept her from working was "PTSD/Depression, fear of people . . . crowds, nightmares, panic attacks, crying, stay home, flash backs." Id.

In the Disability Report, Ms. Platt also provided the following information to compare her activities pre and post onset date:

Household maintenance:

"Used to cook daily and clean, now minimal"

Recreational Activities and hobbies:

"Used to enjoy fishing, night clubs, movies walking my dog now none"

Social contacts:

"used to enjoy friends and family now contact is very little mostly phone"

Other:

"I drive when I have to get groceries or take my daughter to school"

(AR 79) (emphasis in original).

---

[8]Her date of discharge from the Air Force.

Ms. Platt applied for VA disability benefits, but was denied.  (AR 56).  In a Reconsideration Disability Report of September 21, 1995, Ms. Platt wrote that she "continues to experience extreme depression, isolation, panic" with "memory and concentration deficits."  (AR 84).

In a Review Technique of November 27, 1995, S. R. Gunn, Ph.D., acknowledged that Ms. Platt suffered from an affective disorder and an anxiety related disorder.  (AR 98).  The anxiety related disorder was exemplified by "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week [and] . . . [r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." (AR 101-102).

In 1985, Ms. Platt earned $85 and she did not work from 1986 through 1992.  (AR 56).  In 1993, she earned $177 and did not work in 1994.  Id. During one of her jobs in 1995, Ms. Platt testified she worked four half days and on the last day just left crying and then would not leave her home.  (AR 40).  She tried another job that year but it only lasted two days and the same thing happened, she felt "bombarded . . . worthless . . . useless . . . pointless . . . . extremely sensitive."  (AR 41).

Exhibit 22 reflects Ms. Platt's reported work history.  (AR 187-198).

| Job/Time Period | Job Description | Reason for Leaving |
|---|---|---|
| U.S. Air Force 2/80-2/84 | Material Facilities Spec. Supply Clerk | End of 4 year tour – commander did not recommend me for reenlistment |
| Spiegel 12/94 | Call back 9 hrs/week | Only needed for one month |
| Western Staff Services 1/95 (3 days) | Envelope stuffer | Temporary job |
| Automated Maintenance Systems 3/95 (2 nights) | Housekeeper | Too slow |
| Clarkston Guest Home 5/95 (4 half days) | Housekeeper | PTSD/major depression |
| Motel 6 7/95 (2 days) | Laundry worker | PTSD/depression |

Following the initial hearing on Ms. Platt's Social Security disability claim, the ALJ issued his decision on July 23, 1997, which was adverse to plaintiff.  (AR 16-20).  The Appeals Council denied plaintiff's request for review and she then filed a civil action in United States District Court, CIV. 00-5003.  On July 11, 2000, Judge Schreier issued a memorandum opinion and order for remand.  (AR 267-276).

Among the facts found by the district court which are relevant to this current appeal were the following:

1. As a young child, Platt suffered various types of sexual, physical, and mental abuse at the hands of individuals entrusted with her care. (AR 267 at ¶ 2).

2. During her enlistment in the Air Force, Platt had a serious problem with alcohol abuse. Mental health professionals identified her drinking behavior to be partially the result of past abuse and potentially a symptom of post traumatic stress disorder. (AR 267 at ¶ 2).

3. Evidence in the administrative record indicates that the abuse suffered by Platt as a child is linked to her present difficulties with post traumatic stress. (AR 268 at ¶ 3).

4. Once she stopped drinking, Platt became depressed and hypervigilant. She grew to be more and more incapacitated and would often strive to avoid social situations altogether. Id.

5. Near the end of her military obligation, the Air Force recommended Platt not re-enlist. (AR 268 at ¶ 4).

6. After a psychological examination, the Air Force referred her to Eugene Muldavin, a licensed clinical social worker, to help her with her difficulties. Id.

7. The record supports Platt's contention that seeing her small child growing up forced Platt to deal with her own past. (AR 268 at ¶ 5).

8. Between 1994 and 1995, Jack L. Sanders, M.S., Pablo A. Fastino, M.D., and T. H. Shannon, M.D., all diagnosed Platt as having both depression and post traumatic stress disorder. (AR 268-269 at ¶ 7).

9. Shannon labeled her condition as childhood PTSD instead of combat PTSD in discussing Platt's treatment options. Id.

10. Muldavin submitted a [retroactive diagnosis] on a Social Security Psychiatric Review Technique form SSA-2506-BK (10-90). (AR 269 at ¶ 8).

11.     [Muldavin's] report served two goals.  It underscored Platt's position that she had definite and dramatic PTSD before her eligibility for benefits expired on September 30, 1989.  The report also explained that earlier records held by Muldavin and the Air Force regarding Platt were destroyed and lost due to Hurricane Andrew.  Id.

After reviewing the decision of the ALJ of July 23, 1997, (AR 16-20) and the applicable law, the district court found the administrative decision was deficient in that the ALJ:

1.     [F]ailed to adequately develop the documentary and testimonial evidence.  (AR 274 ¶ 22).

2.     [F]ailed to develop the record so that a fair determination of Platt's disability status could be made . . . . Although put on notice of Platt's present diagnosis of childhood PTSD made by a social worker, two licensed physicians, and a past diagnosis reiterated by Muldavin, the ALJ neither discussed nor developed that information, nor addressed how such information may understandably call for an additional retrospective diagnosis.  (AR 274 ¶ 23).

3.     [F]ailed to follow the proper procedure at step two of his inquiry by failing to properly consider or discredit Platt's claimed disability, which is necessary to appropriately deny a claim at step two of the inquiry.  (AR 275 ¶ 24).

4.     [F]ailed to follow the procedures set out in 20 C.F.R. ¶¶ 404.1520 through 404.1520(d) . . . . a special procedure for mental health claims . . . . (AR 275 ¶25).

Based upon these deficiencies, Judge Schreier remanded the case to the Commissioner in accordance with 42 U.S.C. § 405(g).  (AR 276 ¶ 28).

At the remand hearing on June 7, 2001, Ms. Platt's case was heard before ALJ #2.  Ms. Platt reminded the ALJ that she had gone to a "psychiatrist

and a medical doctor on the base[9] maybe three or four months before she started seeing the social worker Eugene Muldaven [sic] but of course those records were all destroyed in the hurricane." (AR 546). At this hearing the ALJ examined James Simpson, Ed.D. After discussing the diagnosis of PTSD for Ms. Platt made by other more recent medical doctors, Dr. Simpson testified this diagnosis was "pretty clear . . . . there's no question about it." (AR 549). Based upon his review of the record Dr. Simpson opined:

> [PTSD] probably started late adolescence and probably was masked by alcohol for a long period of time, became ironically in this case the individual probably became or was reasonably functioning, functioning reasonably well for a period of time, looked okay until she stopped drinking, then this stuff came out. That's where we would get when we talk about self-medicating with alcohol and I think she probably learned that fairly early.

Id. Because of Dr. Simpson's recommendation, ALJ #2 decided to suspend the hearing so a psychologist, paid for by the agency, could perform a retrospective diagnosis of Ms. Platt. (AR 553).

On August 20, 2001, the Denver Region Social Security Office wrote to the Disability Determination Services regarding a retrospective evaluation. (AR 291). Social Security specifically acknowledged that the historical records referenced in Judge Schreier's decision "are reports from acceptable sources . . . ." Id. By Social Security standards "[w]hile these records may not be dated before the claimant's date last insured (DLI), they can serve as evidence of past events. Memories of past events may become less reliable or less specific over

---

[9]Homestead AFB.

time, so these older records are very important." Id.  Social Security directed

Disability Determination Services:

> As the court order for remand states, the claimant is disabled, and the only issue is when she became disabled.  Because the claimant was last insured for disability on September 30, 1989, the medical consultant/advisor should address the existence of and severity of the impairment from September 1989 to October 1995.  He or she should address what limitations the impairment imposed . . . . **If the medical consultant or advisor finds that the information is insufficient to address the existence of an impairment or the limitations imposed by the impairment during the relevant time period, he or she should explain that the information is insufficient to address these issues during that time.**

(AR 292) (emphasis in original).

Instead of scheduling an examination of Ms. Platt by Mark Perronoud, Ph.D., a clinical psychologist, as originally had been contemplated and ordered by ALJ #2, Disability Determination Services had Jerome Buchkowski, Ph.D., a clinical psychologist, complete a paper review of plaintiff's records.  (AR 293-310).[10]

Before the hearing reconvened on November 28, 2001, Ms. Platt expressed her objections to the use of Dr. Buchkowski.  (AR 311-312).  At the hearing Ms. Platt again restated her objections.  (AR 520-523).  ALJ #2 interpreted Judge Schreier's decision as allowing the ALJ the option of using a retrospective evaluation and diagnosis, but he chose not to do so.  (AR 524).

_____

[10]Dr. Buchkowski's opinions will be reviewed in more detail because the Appeals Council rejected his analysis for many reasons.  (AR 352-356).

Rather, the remand hearing proceeded with Dr. Buchkowski's report and additional testimony from Ms. Platt.

At this hearing, plaintiff testified that while her husband was stationed in Korea she lived in Pierre, South Dakota, where she was raped.[11] (AR 528). She did not seek any psychological counseling following that sexual attack, but rather she "isolated completely." (AR 529). She became "hyper viligant," could not sit or sleep, her concentration was "down," and she had "several crying spells." Id. She experienced "[j]ust that jumping out of your skin feeling all the time." Id.

Ms. Platt testified that after her husband returned from Korea in the summer of 1988 she began to experience "vivid nightmares" where "someone would break in the house . . . and [she] would see [herself] being bludgeoned to death." (AR 531). Ms. Platt told her husband about the Pierre rape before she became pregnant in late 1988 or early 1989. (AR 534).

Ms. Platt described herself during this time period as a "blob . . . . very dysfunctional." (AR 532). She was unable to do anything without the assistance of her husband. (AR 533). Ms. Platt testified that while her sister recommended counseling, she did not believe in counseling at that time and did not feel it would do her any good. (AR 530). She did not talk to anyone

---

[11]Ms. Platt's affidavit of December 19, 2006, described in detail her reaction to the rape which occurred on November 14, 1987, in her mother's home. (AR 494 ¶ 4).

other than her husband about this rape until she returned to Florida and started counseling in 1988. (AR 530, 535-536).

Ms. Platt testified that in 1988 she initially saw a physician at the Homestead Hospital and was given antidepressants and then saw a psychiatrist, who referred her to Eugene Muldavin. (AR 535-536). She saw Mr. Muldavin very briefly but stopped going to him once she became pregnant. (AR 537). During this time period Ms. Platt was experiencing the "inability to sleep, irritability, poor concentration, crying spells and sleeping more." (AR 538).

Ms. Platt returned to counseling with Mr. Muldavin after her daughter was born in September of 1989, as she "started having more memories and [she] . . . got worse and worse and worse and worse." (AR 537). She began to experience more "repressed memories" of her childhood. (AR 538). The ALJ did not want to put Ms. Platt under the additional emotional trauma of recounting those events for the record, but rather the ALJ acknowledged she had been "molested as a child" and was later raped. (AR 538-539). The ALJ understood the "generic nature of the trauma. That's good enough." (AR 539).

The ALJ was more interested in confirming that Ms. Platt's memories arose and the other behaviors she described as "the sleeping, the isolation, nightmares" escalated before she starting counseling with Mr. Muldavin in 1989. (AR 540). Ms. Platt confirmed that these issues had escalated and she was "pretty confused" before she returned to her therapist. (AR 540-541). As

her counseling with Mr. Muldavin progressed, Ms. Platt better understood her conflicts and issues. (AR 540-541).

ALJ #2 issued a decision adverse to plaintiff on April 16, 2002. (AR 316-322). The ALJ relied upon the report of Dr. Buchkowski and his conclusion that Ms. Platt's PTSD must not have been very significant because Mr. Muldavin never referred her to a psychiatrist for treatment. (AR 320).

Ms. Platt again appealed this adverse decision to the Appeals Council which on July 23, 2003, issued its order remanding the case to the ALJ. (AR 352-356). Significant to this present review, the Appeals Council ruled "Dr. Buchkowski . . . cannot be regarded as an impartial medical expert as he is apparently a State agency employee." (AR 353). The Appeals Council also declared that there were "significant substantive problems" with Dr. Buchkowski because he had apparently drawn "some inference about the lack of severity of the claimant's mental impairment by the fact her therapist [Mr. Muldavin] had not referred the claimant to a psychiatrist or for hospitalization." (AR 353). The Appeals Council pointed out the 1997 hearing testimony proved Ms. Platt had been seen initially by a psychiatrist who then referred her to the therapist, Mr. Muldavin. (AR 353). "Given this referral by a psychiatrist, there was no reason for the therapist to refer the claimant to a psychiatrist." Id.

The Appeals Council found:

It is therefore unclear what evidence Dr. Buchkowski actually considered . . . . [he] reported the claimant would have moderate difficulties in maintaining social functioning, yet Dr. Buchkowski did not identify any corresponding socialization limitations in his [RFC]

21

> form. Dr. Buchkowski did not provide a function-by-function
> assessment of the claimant's work capabilities but merely concluded
> the claimant was capable of simple job tasks. No other limitations
> were identified . . . . Thus it is unclear how Dr. Buchkowski regarded
> the claimant's mental impairment as severe, when no significant
> limitations in the claimant's mental ability to perform basic work
> activities were identified.

(AR 354).

The Appeals Council further criticized the decision of the ALJ in finding

that Ms. Platt could perform job tasks as a supply clerk. (AR 355). ALJ #2

found that this position did not require the performance of activities precluded

by her limitations, but the Appeals Council concluded that the ALJ had not

provided the necessary rationale to support that conclusion. (AR 355). The

Appeals Council pointed out that "the Dictionary of Occupational Titles (DOT)

identifies 2 supply clerk positions (222.387-058 and 299.367-014). Each job

has an SVP of 4 which appears inconsistent with the claimant's limitation to

simple tasks." Id.

In compliance with the remand directive of the Appeals Council, on July

1, 2004, ALJ #2 advised plaintiff's attorney that a retrospective consultative

examination, at government expense, would be requested of Disability

Determination Services. (AR 361). On July 9, 2004, S. R. Gunn, Ph.D., issued

a Consultant's Report which said in essence that a retrospective evaluation

could not be performed and it would not be reliable. (AR 363). When the ALJ

advised plaintiff that Dr. Gunn's report would be part of the record to be

considered on remand, Ms. Platt's attorney objected and once again requested

22

that a retrospective diagnosis be performed at government expense. (AR 366-367). Plaintiff's counsel reminded ALJ #2 of the 2001 transcript containing confirmation that, with the records and an interview of Ms. Platt, Dr. Mark Perrenoud could complete a valid retrospective diagnosis. (AR 366). The record is void of any response from the ALJ regarding this request.

Another remand hearing was held on March 30, 2005. (AR 407). Ms. Platt waived her right to appear at this hearing. (AR 384). ALJ #2 determined that his decision would be based on the record as it existed at that time. (AR 393).

Because neither the Disability Determination Services nor the ALJ would order a government-paid retrospective diagnosis, plaintiff's attorney had Ms. Platt evaluated by Dr. R. P. Renka of Black Hills Psychiatry Associates in Rapid City, South Dakota. (AR 397). Dr. Renka met with Ms. Platt and completed his Psychiatric Consultation report dated April 15, 2005, and a Psychiatric Evaluation Addendum dated May 24, 2005. (AR 397-402).

Dr. Renka had Ms. Platt's medical records and lay witness statements available for his review as part of his psychiatric evaluation. (AR 397). He also completed a mental status assessment of Ms. Platt. (AR 400). Without restating the factual summaries considered by Dr. Renka as they are previously set forth in this decision, he concluded that Ms. Platt "has all the usual PTSD symptoms, including hypersensitivity to certain triggers,

flashback, and nightmares of rape, drowning, and other bizarre themes." (AR 399).

Dr. Renka's diagnosis was Ms. Platt suffered:

| Axis I: | A. | PTSD, severe. |
| | B. | Major Depression, recurrent. |
| | C. | Dysthymia. |
| | D. | Panic Disorder with Agoraphobia. |
| | E. | Alcohol Abuse, in remission. |

Axis II:      Avoidant Personality.

Axis III:     Scoliosis.

Axis IV:     Severe (PTSD).

Axis V:      GAF: 40

(AR 400-401). Dr. Renka concluded Ms. Platt had "been symptomatic all of her life due to early trauma." (AR 401). He wrote:

> She had a period of relative good functioning, although she was drinking heavily, during the service. Even then, however, her use of alcohol as a tranquilizer got her in trouble, and she wasn't permitted to re-enlist. Her work history since then has been quite limited . . . . She is probably as well adjusted as she will be at this point on high doses of Celexa.

(AR 401). Referring to Ms. Platt's condition in the 1980s, Dr. Renka concluded:

> [S]he was clearly depressed at this point. She was isolated, had gained weight and was oversensitive and somewhat suspicious of the motives of others. This kind of depression is frequently seen in people with PTSD. We have made that diagnosis related to serious abuse and neglect in childhood.

> [Platt] has been disabled to some extent most of her life. She has had periods of improved function such as shortly after her marriage. A typical course of someone with Posttraumatic Stress Disorder is to

experience a chronic depression, usually termed a Dysthymia, and to have periodic expressions of sufficient severity to classify as Major Depression. This is certainly the case with Holly. Therefore, I would consider her disabled as of 1988 and certainly to some extent before that.

(AR 402).

On June 3, 2005, Ms. Platt supplemented the record with a statement from her neighbor, Linda Fogg (AR 394-395), as well as the report and addendum from Dr. Renka. (AR 417). On August 1, 2005, ALJ #2 issued his decision, again adverse to plaintiff. (AR 406-414). Once more, the ALJ rejected the testimony and documentation of Eugene Muldavin and relied heavily upon the report of Dr. Buchkowski. Id. There was no mention made of Dr. Renka's report or conclusions.

For the third time, on July 18, 2006, the Appeals Council rejected the decision of the ALJ. (AR 424-427). The Appeals Council chastised ALJ #2 for using the opinions of Dr. Buchkowski because of the "significant substantive problems with the evaluation and functional assessment . . . ." (AR 425). The Appeals Council also was concerned that the ALJ had not considered the "psychiatric evaluation with a retrospective addendum" of Dr. Renka. (AR 425). After describing the specific procedural steps and substantive records to be considered, the Appeals Council remanded the case for hearing before a different ALJ. (AR 426-427).

On November 8, 2006, through her attorney, Ms. Platt advised ALJ #3 that the "alleged onset date" was being amended to November 14, 1987. (AR 500). This was the date of Ms. Platt's rape in Pierre, South Dakota. (AR 494).

The next remand hearing was held on December 7, 2006. (AR 498). Testifying at this hearing was Ronald T. Houston, Ph.D., a clinical psychologist. (AR 501-512). Dr. Houston is under contract with Social Security to appear and testify as a mental health expert. (AR 502). In preparation for this hearing, he "reviewed the file." Id. Dr. Houston testified that there was "non-sufficient documentation, medical documentation, to sufficiently reconstruct the Claimant's functional limitations as a result of mental impairment." (AR 503).

Referring to Mr. Muldavin's report, Dr. Houston testified:

[T]he report would not be in accordance with a professional standard [for two reasons] . . . . [O]ne is, even in the case of a disaster, medical records are absolutely protected. And there is ways to do that, even in the event of a hurricane or anything like that; and

[T]he other is that the professional standard would say that is so far back in time that my professional ethics would not allow me to provide a reconstructive account.

(AR 503).

Then, in addressing Dr. Buchkowski's reports [Exhibits 37 & 38] (AR 293-310), Dr. Houston opined:

I wouldn't even be so bold to . . . offer an assessment from '84 to '89, based on the paucity of medical documentation and relying almost exclusively on a person's self-report or collateral information provided by family years later . . . . it really doesn't have the necessary validity.

26

(AR 503-504). Dr. Houston did agree, however, that a "retrospective diagnosis, that's very easily done." (AR 505). Dr. Houston agreed it can be accomplished by doing a "developmental history and you can get symptom complaints dating all the way back to adolescence and they could persist into the here and now." (AR 505). But Dr. Houston felt the question is not whether an individual has a mental impairment but whether that impairment has functional limitations. Id. Without medical documentation, Dr. Houston felt that a determination of historical functional limitations could not be completed. (AR 506-507).

Dr. Houston had not reviewed the affidavit of Ms. Platt dated November 14, 2006,[12] or Dr. Renka's report,[13] prior to his testimony at the hearing. Dr. Houston objected to the use of the self-reports of plaintiff, as well as the records of her former counselor Mr. Muldavin, and other lay witnesses to establish the severity of Ms. Platt's impairments during the critical time period, because those are "entirely a subjective reconstruction of people that . . . have provided treatment." (AR 510-511). Dr. Houston preferred "objective medical evidence . . . [as] the professional standard." Id. Likewise, ALJ #3 stated that in his "opinion that regardless of the lay testimony, you have to have objective medical evidence . . . the mental health area, you have to have professional opinions." (AR 513).

---

[12]Exhibit 77 (AR 507).

[13]Exhibit 60 (AR 511).

On February 7, 2007, ALJ #3 issued his 21-page decision which again was adverse to plaintiff. (AR 245-265). Critical to this appeal, the ALJ found:

1. Between November 14, 1987, and her last insured date of September 30, 1989, Platt had not engaged in substantial gainful employment;

2. Through September 30, 1989, Platt had a history of depression and PTSD; and

3. Through September 30, 1989, Platt did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities; therefore, she did not have a severe impairment or combination of impairments.

(AR 252) (summarized). To arrive at these conclusions, the ALJ found:

[Platt's] statements concerning her impairments and their impact on her ability to work on and prior to [September 30, 1989] are not credible in light of the medical evidence and the discrepancies between [Platt's] assertions and the information contained in the documentary reports.

(AR 253-254).

After an approved extension to file objections to that decision, on May 20, 2008, plaintiff filed her exceptions. (AR 235-236). On November 7, 2008, the Appeals Council declined jurisdiction over the case and the decision of the ALJ became the final decision of the Commissioner. (AR 231). Plaintiff timely filed her complaint in district court. (Docket 1).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Choate v. Barnhart</u>, 457

F.3d 865, 869 (8th Cir. 2006). The court must review the Commissioner's decision to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).

Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind might find it adequate to support the conclusion. <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's decision. <u>Choate</u>, 457 F.3d at 869 (quoting <u>Ellis v. Barnhart</u>, 392 F.3d 988, 993 (8th Cir. 2005)). The review of a decision to deny disability benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would have decided the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " <u>Reed</u>, 399 F.3d at 920 (quoting <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

ALJ #3 was critical of the Appeals Council's directive on remand that Ms. Platt had impairments which were severe under the regulations. (AR 254). The ALJ asserted neither the district court nor the Appeals Council ever identified those impairments. Id. Thus, the ALJ decided that the remand instruction was incompatible with the regulations. Id. However, based on the record, there can be no serious question that the "severe" impairments focused upon by both the district court and the Appeals Council are the same two impairments ALJ #3 identified - PTSD and depression.

Despite the Appeals Council's directive on remand that this case be heard by a different ALJ to get an unbiased and fresh review of the record, ALJ #3 took verbatim four pages and substantially all of a fifth page of the factual statements and conclusions from the discredited decision of ALJ #2 of August 1, 2005.[14] Those passages appear at pages 11, 12, 13, 14, and 15 of the decision of ALJ #3.[15] Those passages constitute a significant and inseparable portion of the material upon which ALJ #3 placed emphasis to arrive at substantial evidence in support of his February 7, 2007, decision.

Like ALJ #2, and using the same language, ALJ #3 found that it "[i]s reasonable to conclude that Mr. Muldavin's recollection of the claimant's condition seven years earlier may also be vague . . . ." (AR 255). ALJ #3 thus

---

[14]AR 409-412, 413.

[15]AR 255-258, 259.

"accords little weight to his opinions as to the claimant's functioning seven years earlier." (AR 256). ALJ #3 concluded that "Mr. Muldavin speculated the claimant's symptoms based strictly upon the claimant's reports, however the evidence of record does not supported [sic] the claimant's reporting functioning to that degree seven years earlier." Id. Those conclusions ignore Mr. Muldavin's statement that he clearly remembered Ms. Platt and remembered treating her. (AR 230). Further, ALJ #3 failed to acknowledge that Mr. Muldavin, as a licensed clinical therapist, provided nearly weekly treatment and counseling to Ms. Platt from 1990 until Hurricane Andrew in August 1992. This is not speculating backwards as suggested by the ALJ.

The ALJ also suggested that the exhibit which reported Ms. Platt's U.S. Air Force service, from February 1980 to February 1984, was proof that she was capable of functioning in a position of employment. (AR 256). Yet the ALJ ignored the very next phrase in that exhibit: "commander did not recommend me for reenlistment." (AR 198).[16] The ALJ also ignored Ms. Platt's statements which acknowledged she was a very heavy drinker during her military service. (AR 47). Finally, the ALJ makes no reference to her statements to Dr. Renka that she became a "quite heavy drinker," had "some blackouts," and received an "Article 15 nonjudicial punishment" as the result of her failure and inability to properly perform her service duties. (AR 397). Dr. Renka concluded that "her use of alcohol as a tranquilizer got her in trouble, and she wasn't

---

[16]Exhibit 22/12 (AR 198).

permitted to reenlist." (AR 401). The ALJ is not entitled to pick and choose what portion of a document or testimony he wishes to accept as factually accurate, while ignoring related information in the same document or from a medical care provider. <u>Reed v. Barnhart</u>, 399 F.3d 917 (8th Cir.2005); <u>Haley v. Massanari</u>, 258 F.3d 742 (8th Cir. 2001).

ALJ #3 used this same impermissible approach in his references to Jim Platt's sworn affidavit and the comparison of this testimony to other collateral sources. (AR 256). The ALJ cites only part of Mr. Platt's affidavit at paragraph VII, "from that point on it went down hill really bad" and then suggests that a collateral source reference[17] contradicted Mr. Platt, in essence suggesting that Ms. Platt went to therapy and began to "get a little grip on reality." (AR 256). This was not a fair or accurate representation of the testimony of either Mr. Platt or Holly's sister, Ms. Hadrick.

The remainder of Mr. Platt's affidavit emphasizes and highlights the time specific nature of his wife's "down hill" slide:

> In 1987, Holly . . . started isolating herself . . . started crying over nothing. . . . [After returning from Korea in 1988, Jim observed] [a]t this point Holly had wild mood changes. She had gained more weight and was isolating herself. She would have crying spells. Everything was worse than right before I left for Korea. . . . [After January 1989 when Holly became pregnant] [a]ll of her symptoms got even worse and she went into a major depression. . . . After our baby was born, everything got ten times worse. Holly isolated herself so much that she wouldn't even sleep in our bed with me. She would stay in the bedroom . . . with . . . our daughter. . . .

(AR 184-185).

---

[17]Gloria Hadrick, Ms. Platt's sister. <u>See</u> AR 182-183.

Likewise, Ms. Hadrick's affidavit was taken out of context. Ms. Hadrick described her sister's pre-pregnancy lifestyle in detail. (AR 182). The "short time period" when Ms. Platt "started to get a grip on reality" as her sister described clearly began, and ended, in the time frame of 1990 to August of 1992 - after the critical issue deadline of September 30, 1989. (AR 183). Even then, this brief respite from her uncontrolled, major depression only lasted for a short period of time. When compared in detail, the testimony of Mr. Platt and Ms. Hadrick do not contradict the other, nor do they contradict Ms. Platt's testimony. Rather, both lay witnesses support Ms. Platt's testimony about the severity of her impairments during this critical time period.

ALJ #3 improperly and incorrectly accepted the previous ALJ's inadequate rendition of facts related to the time period of November 14, 1987, to September 30, 1989.[18] ALJ #3 likewise incorrectly adopted the previous ALJ's interpretation of Dr. T. H. Shannon's records.[19] Dr. Shannon's diagnosis identifies Ms. Platt's Axis I diagnosis as "PTSD, rape and sexual abuse" and "alcohol abuse" and makes no suggestion that the PTSD and depression were limited solely to the traumatic experiences of Hurricane Andrew in 1992. (AR 112). The sexual abuse occurred when Ms. Platt was a child and the rape, which was the defining start date for the analysis of her claim before the ALJ,

_____

[18]See decision of ALJ #2 of August 1, 2005. (AR 409-412, 413).

[19]AR 256 compared to AR 410.

occurred on November 14, 1987. These are all events which occurred before September 30, 1989.

ALJ #3 ignored the interface between plaintiff's 1995 records and her pre-September 30, 1989, diagnosis. Apparently seeking to separate Dr. Shannon's diagnosis from counselor Jack Sanders' assessment, the ALJ declared that the evidence "suggests claimant was having flashbacks and nightmares that incapacitated her . . . , the record does not support such occurred on or prior to September 1989." (AR 257). The ALJ ignored Dr. Shannon's diagnosis of PTSD, prior to Ms. Platt's military service and accepted counselor Sanders' delayed onset impression that the "emergence occurred around 1994, beginning with PTSD due to a hurricane." (AR 257). The evaluation of ALJ #3 failed to acknowledge the record, including Mr. Muldavin, Dr. Shannon, Dr. Renka, which credibly establishes plaintiff's PTSD as being caused by the childhood sexual abuse and rape as an adult, events which all occurred before September 30, 1989.[20]

In similar fashion, ALJ #3 continued improperly to rely upon the report and opinions of Dr. Buchkowski, as had the previous ALJ.[21] Dr. Buchkowski's participation in this record had been rejected by the Appeals Council twice on both procedural and substantive grounds. (AR 353). Yet, the ALJ insisted on

---

[20]The experience of living through a hurricane may have exacerbated Ms. Platt's symptoms, but the substantial evidence is that her impairments of PTSD and depression were severe long before Hurricane Andrew in 1992.

[21]AR 258 compared to AR 412.

using Dr. Buchkowski's conclusion that Mr. Muldavin failed to refer Ms. Platt to a psychiatrist as proof of the lack of severity of Ms. Platt's impairments. (AR 258). The analysis of the ALJ gives substantial weight to the work of Dr. Buchkowski despite the decision of the Appeals Council and the remainder of the record, which fully debunked Dr. Buchkowski's erroneous assumption.

ALJ #3 fixated on plaintiff's change of onset date from 1984 to November 14, 1987. Yet he never mentioned, and thus it must be presumed he failed to consider, that Ms. Platt was raped in Pierre, South Dakota, on that date. The 1987 rape event is the date after which Ms. Platt claims that her childhood PTSD and depression were exacerbated to the point that her impairments became severe under the regulations. There is no basis for the suggestion of the ALJ that plaintiff was simply searching around for an onset date which may work. (AR 258-259). Rather, the decision of Ms. Platt and her attorney to amend the date of onset to November 14, 1987, is logical and consistent with the date of the onset of a severe impairment.

ALJ #3 chose to accept the conclusions of Dr. Houston, who examined only parts of the record, over the conclusions of Dr. Renka, who examined Ms. Platt's records and performed a personal examination of plaintiff. (AR 261-264). Notwithstanding Dr. Houston's personal preference not to use Mr. Muldavin's records, the law clearly allows and encourages the use of reconstructed records, as well as post onset date records, to look back and

evaluate the severity of an impairment by a date certain. <u>Jones v. Chater</u>, 65 F.3d 102 (8th Cir. 1995); <u>Ivy v. Sullivan</u>, 898 F.2d 1045 (5th Cir. 1990).

It is also clear from the hearing transcript of November 28, 2006, that Dr. Houston had not examined Dr. Renka's records before the start of that proceeding. (AR 511). It is equally clear that when Dr. Houston briefly reviewed those records during the hearing he did not consider Dr. Renka's Psychiatric Evaluation Addendum of May 24, 2005.[22] <u>Id.</u> Yet, the ALJ placed substantial weigh on Dr. Houston's conclusions to the exclusion of the detailed medical review and examination performed by Dr. Renka. (AR 262). ALJ #3, continuing his earlier dismissal of Mr. Muldavin's opinions based upon Dr. Buchkowski's report, minimized Dr. Renka's use of Mr. Muldavin's report as a treating, primary therapist. (AR 263).

The ALJ also took out of context the statement of Dr. Renka, who when using the analogy of a cardiovascular patient, suggested the "final result is there for all to see" even though the cardiologist "may not know a time of origin . . . ." (AR 492). Contrary to the suggestion of the ALJ, Dr. Renka was not saying that he did not "know a time of origin" for the onset of the severity of Ms. Platt's PTSD and severe depression, because Dr. Renka unequivocally concluded that she suffered from severe PTSD and major depression to such a degree that she was "disabled as of 1988 and certainly to some extent before that." (AR 402).

--------------------

[22]AR 402.

Contrary to the decision of the ALJ, objective clinical evidence of Ms. Platt's function in the critical time period of 1987 to September 30, 1989, does exist. Substantial evidence was adduced through Mr. Muldavin, who rendered clinical care to Ms. Platt immediately after the critical deadline, and through the treatment by Dr. Shannon and the other V.A. care providers, as well as by the objective clinical work of Dr. Renka. This is evidence which "fairly detracts from [the Commissioner's] decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994). The records, when examined in detail, support rather than contradict the testimony of plaintiff. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Guilliams v. Barnhart, 393 F.3d 798, 801-802 (8th Cir. 2005).

The federal district court, the Appeals Council and ALJ #3 all concluded that Ms. Platt had a "medically determinable . . . mental impairment" under 20 C.F.R. §§ 416.920a(b)(1) and 404.1520a(b)(1). Those impairments are PTSD and depression.

The next step in the analysis requires a determination as to the "degree of functional limitation resulting from the impairment." 20 C.F.R. §§ 416.920a(b)(2) and 404.1520a(b)(2). That rating of functional limitation is done under the guidance of 20 C.F.R. §§ 416.920a(c)(2) and 404.1520a(c)(2), and evaluates the extent to which the impairment interferes with a claimant's "ability to function independently, appropriately, effectively, and on a sustained

basis." The areas of function which are rated are identified as "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 416.920a(c)(3) and 404.1520a(c)(3).

The first of these three activities - daily living, social functioning, and concentration, persistence or pace - are rated on a five-point scale of "none, mild, moderate, marked and extreme" while the fourth activity - episodes of decompensation - is judged on a four-point scale of "none, one or two, three, four or more." 20 C.F.R. §§ 416.920a(c)(4) and 404.1520a(c)(4). "Extreme" and "four or more" each "represents a degree of limitation that is incompatible with the ability to do any gainful activity." Id. A claimant entitled to benefits needs to be rated in the "marked or extreme" category in the first three areas and something more than "none" in the fourth area. 20 C.F.R. §§ 416.920a(d)(1) and 404.1520a(d)(1). If the mental impairment is rated as "severe," as is the case for Ms. Platt, the regulations then require a determination of whether the severe impairment "meets or is equivalent in severity to a listed mental disorder." 20 C.F.R. §§ 416.920a(d)(2) and 404.1520a(d)(2).

Based on the record before the court, prior to September 30, 1989, the ratings of Ms. Platt in daily living, social functioning, and concentration, persistence or pace were "marked" and her episodes of decompensation certainly "exceeded four or more" times during the critical time period; thus, her impairments were "severe." The combination of these rated impairments

had a severe impact on Ms. Platt's ability to do more than minimum levels of basic work activities contemplated by 20 C.F.R. §§ 416.920a(d)(1) and 404.1520a(d)(1). Unquestionably, severe PTSD and severe depression meet or are equal to a listed mental disorder in Appendix 1 of subpart P of § 404, section 12.

SSR 83-20 provides guidance to the ALJ and this court in determining the onset date of disability.[23] Under this program policy statement for disabilities of a nontraumatic nature, the establishment of the onset date requires consideration of the plaintiff's allegations, work history, and medical and other evidence relating to impairment severity.

> With slowly progressing impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describes the history and symptomatology of the disease process.

Id. The SSR further advises that determining how long the disease "existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis." Id. SSR 83-20 further directs:

> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can

---

[23]Social Security Program Policy Statements, 1983-1991 Soc. Sec. Rep. Serv. 49, 1983 WL 31249 (S.S.A.).

reasonably be made about the course of the condition).  The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA[24] (or gainful activity).

Id.

It is evident from a detailed examination of the decision that ALJ #3 neither properly considered the directives of SSR 83-20 nor properly applied the dictates of that regulation in light of the lay evidence and documentation provided by Mr. Muldavin and the retrospective evaluation and diagnosis supplied by Dr. Renka.  In that regard, the ALJ erred as a matter of law.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

Like the plaintiff in Ivy v. Sullivan, 898 F.2d 1045 (5th Cir. 1990) (medical records lost through a burglary), Ms. Platt is unable to produce her medical records during the relevant time period because of an intervening cause, a major hurricane.  Yet, Mr. Maldavin, like Ivy's doctor, had an excellent and detailed recall of his patient's condition.  Id. at 1047.   Rejecting the conclusion of the ALJ in Ivy, the Fifth Circuit declared that the "production of precise medical records is not a requisite to the establishment of a disability onset date."  Id. at 1049.  Citing the regulation authority of SSR 83-20, the court reasoned:

[E]stablished policy provides that information may be obtained from family members, friends, and former employers regarding the course of the claimant's condition . . . . noncontemporaneous medical

------

[24]Substantial gainful activity.

records are relevant to the determination of whether onset occurred on the date alleged . . . . "Subsequent medical evidence is relevant . . . because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status."

Id. (internal citations omitted). Like the ALJ in Ivy, ALJ #3 improperly "rejected uncontroverted evidence . . . . her work history, the testimony of her husband, her own testimony, the medical opinions of [her licensed clinical therapist] and her noncontemporaneous medical records all [of which] are consistent" with the claim of Ms. Platt that her severe disability began on November 14, 1987. Id.

In Jones v. Chater, 65 F.3d 102 (8th Cir. 1995), the court examined the issue of late recognition of PTSD. Jones, a Vietnam War veteran, began to experience classic PTSD symptoms shortly after his return from the war. Id. at 103. However, his medical records were devoid of any reference to PTSD until the 1990s. Because there were no contemporaneous medical records to corroborate the retrospective medical diagnosis and onset date established by his physician, the ALJ rejected Jones' application for a pre-1975 onset date. Id. Reversing that decision, the Eighth Circuit acknowledged that "PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation." Id. at 103 (internal citations omitted). The court concluded that the retrospective medical opinion needed to be evaluated in light of the testimony not only of the claimant, who the ALJ found to not be credible in Jones, but also in light of the

corroborating witnesses who knew the claimant both before and after the alleged onset date.  Id. at 104.

Like the claimant in Jones, Ms. Platt's retrospective medical record and the opinions of Dr. Renka are supported and corroborated by the lay witnesses, Ms. Platt's sister and husband, as well as Mr. Maldavin.  The testimony of each of the lay witnesses was internally consistent with each other and consistent with the noncontemporaneous medical opinion of Dr. Renka.  Therefore, ALJ #3 was in error in rejecting Dr. Renka's medical opinion that her "severe PTSD and major, recurrent depression" rendered Platt disabled in 1988 and earlier. (AR 401-402).  This conclusion is supported by Likes v. Callahan, 112 F.3d 189, 191 (5th Cir. 1997) ("Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability, and properly corroborated retrospective medical diagnoses can be used to establish disability onset dates.") and Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984) ("medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status.").

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing.  42 U.S.C. § 409(g).  If the court determines that the "record overwhelming supports a disability finding and remand would merely delay the receipt of benefits to

which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992).

## CONCLUSION

Judge Schreier found that Ms. Platt had a severe impairment of PTSD and depression. The Appeals Council on at least two occasions determined that plaintiff suffered a severe impairment of PTSD and depression. Mr. Muldavin, as a lay witness with a clinical therapy background and based upon his care and treatment of Ms. Platt, concluded that her PTSD and depression severely impaired her daily living functions in all respects back in the 1987-1988 time period. Dr. Renka, a qualified psychiatrist, who not only reviewed the records but personally examined Ms. Platt, concluded that her severe PTSD and major depression, as a result of childhood sexual abuse and rape as an adult, caused her to be disabled as of 1988. In contrast, the decision of the ALJ was not supported by the substantial evidence. This record supports the conclusion that Ms. Platt was severely disabled within the meaning of Title II as of November 14, 1987, and certainly prior to September 30, 1989.

After so many years in the adjudication and appeals process it is clear to this court that a remand would simply delay Ms. Platt's right to receive benefits to which she is entitled. Therefore, reversal is the appropriate remedy at this juncture. Thompson, supra. In accordance with the above decision, it is hereby

ORDERED that the decision of the Commissioner is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff to which she is entitled under the Act.

IT IS FURTHER ORDERED that the Clerk of Courts enter judgment in favor of the plaintiff Holly A. Platt and against defendant Michael J. Astrue, Commissioner of the Social Security Administration.

Dated March 29, 2010.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE